UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

SCOTT L. BRADY,                                      Case No. 6:24-cv-00885-MTK

      Plaintiff,                                  **OPINION AND ORDER**

v.

CENLAR, FSB; QUALITY LOAN SERVICE
CORPORATION; and CITIMORTGAGE,
INC.,

      Defendants.

---

**KASUBHAI,** United States District Judge:

      The claims of Plaintiff Scott L. Brady ("Plaintiff") arise out of a loan dispute that resulted in a nonjudicial foreclosure sale of Plaintiff's home ("Property"). Am. Compl., ECF No. 10. Before the Court are several motions to dismiss Plaintiff's Amended Complaint, filed by Defendant Cenlar, FSB ("Cenlar Mot.," ECF No. 13), Defendant CitiMortgage, Inc. ("Citi Mot.," ECF No. 18), and Defendant Quality Loan Service Corporation ("Quality Mot.," ECF No. 20) (collectively, "Motions"). For the reasons explained below, Defendants' Motions are GRANTED in part and DENIED in part.

## BACKGROUND

The following allegations are accepted as true for purposes of ruling on the present Motions.[1]

### I.     The Loan

On March 6, 2006, Plaintiff took out a $150,000 loan for personal use. Am. Compl. ¶¶2-3. To obtain the loan, Plaintiff signed a promissory note ("Note"), secured by a deed of trust ("Deed of Trust") for the Property. At the relevant period, Defendant CitiMortgage, Inc. ("Citi") was the beneficiary of the Deed of Trust; Defendant Quality Loan Service Corporation ("Quality") was the trustee of the Deed of Trust; and Defendant Cenlar, FSB ("Cenlar") was the loan servicer who acted on behalf of Citi to service Plaintiff's loan payments. Am. Compl. ¶¶ 4-6.

Plaintiff's Note had a maturity date of April 1, 2021, at which date the balance of Plaintiff's loan would come due. *Id.* at ¶ 9. The first paragraph of the first page of the Note stated in bold capital letters:

> **THIS LOAN IS PAYABLE IN FULL AT MATURITY. SINCE YOU HAVE SELECTED A PAYMENT SCHEDULE WHICH WILL NOT PAY THE LOAN IN FULL BY THE MATURITY DATE, YOU WILL NEED TO PAY A LUMP SUM, OR BALLOON PAYMENT, WHICH WILL PAY OFF THE**

---

[1] These facts are taken from the allegations in Plaintiffs' Amended Complaint and from publicly recorded documents incorporated into the Amended Complaint and attached to Defendants' Motions. Specifically, the Court considered the Note, Deed of Trust, Notice of Default and Election to Sell, and Recorded Notice of Sale. *See* Abbott Decl. Ex. A ("Note") and Ex. B ("Deed of Trust"), ECF No. 14, Reply to Quality's Mot. to Dismiss, Ex. 1 ("Notice of Default and Election to Sell") and Ex. 2 ("Recorded Notice of Sale"), ECF No. 40. Plaintiff's allegations necessarily rely on these documents, the documents are publicly recorded, and the parties do not dispute their authenticity. The Court declines to consider any other extrinsic evidence or to construe the Motions as a motion for judgment on the pleadings or summary judgment. *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 967 (9th Cir. 2017) (relying on allegations in the complaint and the publicly-recorded Note and Deed of Trust attached to the defendant's motion to dismiss); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("[A] court may take judicial notice of matters of public record." (internal quotation marks omitted)).

**ENTIRE AMOUNT OF THE PRINCIPAL BALANCE OF THE LOAN AND ANY UNPAID INTEREST THEN DUE.**

Note, A-2. The Note stated that the maturity date of the loan was April 1, 2021 and that Plaintiff was required to pay the remaining balance of the loan "in full, on that date." Note, § 3.

Under Section 4 of the Note, titled, "Borrower's Failure to Pay as Required," the Note stated that Plaintiff would be in default if he failed to make an overdue payment following the lender's notice of a failure to pay. Note § 4(C). The Note granted the lender (Citi) discretion over how to proceed in the event of a default, stating "[i]f I [(Plaintiff)] am in default, the Note Holder *may* require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. Note § 4(C) (emphasis added). The Note explained that Citi's forbearance, if it opted not to demand immediate payment in full following a default on the monthly payments, was not a waiver of its right to demand immediate payment in full in the event of a future default. Note § 4(C).

As collateral for the $150,000 loan, Plaintiff executed a deed of trust. Deed of Trust at B-2. The Deed of Trust conveyed Plaintiff's Property to a trustee (Quality). *Id.* at B-1. If Plaintiff failed to pay back the lender (Citi), the trustee (Quality) had the power to sell the Property for the benefit of the beneficiary/lender (Citi). *Id.* at B-2. The Deed of Trust specified that "forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy." *Id.* at ¶ 10.

Under the "Non-Uniform Covenants" section of the Deed of Trust, Plaintiff agreed to an acceleration clause which stated in part:

> If the breach is not cured on or before the date specified in the notice, Lender, at Lender's options, *may* declare all of the sums secured by this Deed of Trust to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law.

*Id.* at ¶ 17 (emphasis added). In other words, a default on the monthly payments or the balloon payment each provided an independent basis for Citi to foreclose on Plaintiff's Property.

## II.    Plaintiff's Default

As servicer of the loan on behalf of Citi, Cenlar withdrew monthly loan payments directly from Plaintiff's bank account. Am. Compl. ¶ 7. When the loan matured on April 1, 2021, Plaintiff was current on his monthly payments. *Id.* at ¶ 8. Plaintiff alleges that he was not notified that the full remaining balance on the loan was due, and Cenlar continued to withdraw Plaintiff's monthly payments through August 2021. *Id.* at ¶¶ 9–10.

After withdrawing Plaintiff's August 2021 payment, Cenlar "began refusing to withdraw monthly payments." *Id.* at ¶ 12. On January 21, 2022, Cenlar sent Plaintiff a letter asking him to pay the "monthly payments" owed up to that date, $7,095.04. *Id.* at ¶¶ 13–14. After receiving the letter, Plaintiff sent a check for $7,095.04, however, Cenlar returned the check, claiming that Plaintiff's payment was inadequate. *Id.* at ¶ 15. Cenlar sent a similar letter on May 18, 2022, demanding $11,329.80. *Id.* at ¶ 13. In response, Plaintiff sent a check for $11,329.80, which Cenlar returned, claiming that Plaintiff's payment was inadequate. *Id.* at ¶ 16. This pattern repeated a third time following Cenlar's September 12, 2022 letter, which demanded $15,329.56. *Id.* at ¶¶ 13–16. "Each of these letters sought the monthly payments that Plaintiff owed up to that date and did not include a request to pay the balance of the loan." *Id.* at ¶ 14.

On October 11, 2022, Plaintiff's former counsel sent Cenlar a letter ("October Letter") "pursuant to the Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. § 2605[.]" *Id.* at ¶ 18. The October Letter explained that there was a dispute between Cenlar and Plaintiff. *Id.* at ¶ 22. The October Letter requested that Cenlar accept the amount Cenlar had allegedly described as the "total amount due" and requested that Cenlar stop reporting Plaintiff as delinquent on his credit report. *Id.* at ¶ 19. The October Letter also requested (1) an accounting from the loan's

origin; (2) a copy of the inspection reports and proof of Cenlar's payment of the inspection report; and (3) copies of all communications sent to Plaintiff for the past three years. *Id.* at ¶¶ 22–25.

In response, Cenlar denied Plaintiff's request for acceptance of the amount Cenlar had allegedly described as the total amount due, and it continued reporting Plaintiff as delinquent on his credit report. *Id.* at ¶¶ 19–20. Cenlar also responded by sending an accounting beginning in January 2020, but it did not send a full accounting from the loan's origin, and it refused to comply with the other requests in the October Letter. *Id.* at ¶¶ 22–25. Plaintiff alleges that because Cenlar continued reporting him as delinquent on his credit report, he was unable to refinance the loan owed to Citi and could not secure funding to make the balloon payment. *Id.* at ¶ 21.

### III.    The Foreclosure Sale of the Property

After Cenlar sent its allegedly inadequate response to Plaintiff's October Letter, it then employed Quality to conduct a nonjudicial foreclosure sale of Plaintiff's Property. *Id.* at ¶ 27. In December 2023, Quality served Plaintiff notice that the entire balance of the loan was due because the Note had matured. Notice of Default and Election to Sell at 2. The Notice of Default and Election to Sell stated that on April 24, 2024, at 10:00 AM, Quality intended to conduct a nonjudicial foreclosure sale of Plaintiff's Property. *Id.* at 3; Am. Compl., ¶ 28. It also stated that the total amount required to pay off the loan and avoid foreclosure was $131,956.27. Notice of Default and Election to Sell at 1.

On April 19, 2024, Plaintiff's former counsel filed this action and then sought conferral with Quality's counsel about the foreclosure sale. Am. Compl., ¶ 29. On April 22, 2024, Quality's counsel indicated that the sale had been postponed to May 15, 2024. *Id.* at ¶ 30. Plaintiff's former "counsel repeatedly requested proof of service of [notice of] the amended sale

[date]; however, only after multiple requests, Quality produced an affidavit claiming to have served the amended notice in January 2024." *Id.* at ¶ 34. Plaintiff alleges that Quality could not have served the affidavit of service of the amended notice in January 2024 because Quality did not amend the sale date until after Plaintiff brought this lawsuit in April 2024. *Id.* at ¶ 38; Recorded Notice of Sale at 8. Plaintiff also alleges that he did not receive service of the amended sale date, and that Quality failed to record notice of the amended sale date Am. Compl., ¶ 40.

Quality published notice in the Woodburn Independent that the foreclosure sale would occur on April 24, 2024. *Id.* at ¶¶ 36, 40. Plaintiff alleges that Quality failed to publish the amended sale date and failed to publish the notice of sale in a more widely circulated newspaper. *Id.* at ¶¶ 40–41. Plaintiff alleges that if Quality had properly published the notice, more purchasers would have come to the sale and the Property would have sold for an amount far closer to the fair market value (over $1,000,000) not the amount for which former Defendant Bowen Enterprises, Inc. paid (approx. $137,000). *Id.* at ¶ 42.

Plaintiff alleges that Defendants' conduct caused economic and non-economic damages including "upset, worry, frustration, anger, and other negative emotions." *Id.* at 43.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Los Angeles Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Id.* To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to

enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Los Angeles Lakers, Inc.*, 869 F.3d at 800. The Court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## DISCUSSION

Plaintiff brings seven claims for relief arising out of the nonjudicial foreclosure sale of Plaintiff's Property, Defendants move to dismiss.

## I.    Claim One – Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. § 2605

Plaintiff alleges that Cenlar's response to the October Letter violated RESPA because it was untimely, it was inadequate, and it failed to stop reporting Plaintiff as delinquent. Cenlar argues that it had no duty to respond because the October Letter was not a qualified written request ("QWR"), and even if it was a QWR, its response complied with RESPA.

### A.    Determination of a QWR

RESPA "provides an action for damages against mortgage-loan servicers who fail to respond to certain types of inquiries from borrowers." *Medrano v. Flagstar Bank, FSB*, 704 F.3d

661, 663 (9th Cir. 2012). The loan servicer's "duty to respond," however, is only triggered by a "qualified written request." *Id.* at 665.

Whether a borrower's letter is a QWR "should be 'construed liberally' to serve the statute's remedial purpose." *Id.* at 665–66. To qualify as a QWR, the borrower's letter does not require any "magic" words:

> Instead, under § 2605(e), a borrower's written inquiry requires a response as long as it (1) reasonably identifies the borrower's name and account, (2) either states the borrower's "reasons for the belief . . . that the account is in error" or "provides sufficient detail to the servicer regarding other information sought by the borrower," and (3) seeks "information relating to the servicing of [the] loan." 12 U.S.C. § 2605(e)(1)(A)–(B).

*Medrano*, 704 F.3d at 666 (alteration original).

Only inquiries related to the servicing of the loan create a statutory duty to respond. *Id.* Under RESPA, [t]he term 'servicing' means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3). "The statute thus distinguishes between letters that relate to borrowers' disputes regarding servicing, on the one hand, and those regarding the borrower's contractual relationship with the lender, on the other." *Medrano*, 704 F.3d at 667. The former necessarily triggers an obligation to respond under RESPA. *Id.*

Cenlar argues that the October Letter was not a QWR because it sought information unrelated to the servicing of the loan, such as the inspection reports. The Court disagrees. Even if a borrower's information request is overbroad or unduly burdensome, the loan servicer is still required to identify the valid portions of the information request and respond accordingly. 12 C.F.R. § 1024.36(f)(1)(iv). Requesting information extraneous to the servicing of the loan does

not invalidate the QWR. The October Letter was in written form, it enabled Cenlar to identify Plaintiff and his account, and it stated that there was a dispute between Plaintiff (the borrower) and Cenlar (the servicer). Plaintiff alleges that the account was in error because he had received multiple letters with varying amounts stating the total amount due which Cenlar had subsequently refused to accept. Requests for information related to the servicer's "[f]ailure to accept a payment that conforms to the servicer's written requirements" triggers the servicer's obligation to respond. 12 C.F.R. § 1024.35(b)(1). Plaintiff plausibly alleges that the October Letter was a QWR.

**B.      Cenlar's Response to the QWR**

Under 12 U.S.C. § 2605(e), loan servicers have several obligations following receipt of a QWR. Cenlar argues that even if Plaintiff plausibly alleges that the October Letter was a QWR, Cenlar's response complied with RESPA.

1.      <u>Cenlar's Factual Challenges to Plaintiff's Allegations</u>

Cenlar attaches to its motion what it purports to be Plaintiff's QWR and Cenlar's response letter. Cenlar asserts that these documents undermine the truth of Plaintiff's allegation that its QWR response was inadequate. Plaintiff objects to the incorporation of these documents and argues that Cenlar strategically omits additional relevant documents. Although Plaintiff does not challenge the authenticity of the documents attached to Cenlar's motion, he persuasively argues that they frame an incomplete picture. The evidentiary weight of these documents is disputed, and the Court will not consider them at the motion to dismiss stage because "factual challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee*, 250 F.3d at 688.

2.      Timeliness of Cenlar's Response to the QWR

Cenlar argues that its QWR response was timely. Plaintiff responds that Cenlar failed to provide a written response acknowledging receipt of the QWR within five business days. 12 U.S.C. § 2605(e)(1)(A) (the loan servicer has five business days to provide a written response acknowledging receipt of the correspondence). The parties also dispute whether Cenlar had 30 business days or seven business days to substantively respond to Plaintiff's QWR. Both parties, however, stray too far from the allegations contained in Plaintiff's Amended Complaint. A brief in opposition to a motion to dismiss cannot be used to amend the complaint. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). Plaintiff does not allege that Cenlar failed to provide a written response acknowledging receipt of the QWR. Nor does the Amended Complaint put the timeliness of Cenlar's QWR response letter at issue; Plaintiff fails to allege the date that Cenlar responded, that its response was untimely, or that it violated the relevant provision regulating timeliness of a QWR response. Plaintiff's RESPA claim, as it relates to the timeliness of Cenlar's notice of receipt and the timeliness of Cenlar's QWR response is dismissed.

3.      Adequacy of Cenlar's Response to the QWR

Regarding the substance of Cenlar's response to the QWR, Cenlar argues that it adequately responded because the information requested in Plaintiff's QWR did not relate to the servicing of the loan. Under RESPA, the loan servicer is required to provide the borrower with the information requested in a QWR that relates to the servicing of the loan. 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.36(a). The loan servicer must conduct a reasonable investigation and "provide the borrower with a written explanation or clarification that includes . . . [the] information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer." 12 U.S.C. § 2605(e)(2)(C)(i); 12 C.F.R. §

1024.36(d)(1)(ii). Plaintiff's QWR included requests for information related to the servicing of the loan such as copies of communications between Plaintiff and Cenlar and Plaintiff's payment history with Cenlar. Plaintiff's allegation that Cenlar failed to provide this information in response to his QWR plausibly states a claim under RESPA.

4.    <u>Delinquent Reporting</u>

Following the receipt of a QWR related to a dispute regarding the borrower's payments, the loan "servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency" for 60 days. 12 U.S.C. § 2605(e)(3). Plaintiff alleges that the QWR related to a dispute regarding his attempts to pay Cenlar the amount it had previously demanded. Plaintiff also alleges that because Cenlar refused to stop reporting him as delinquent on his credit report, he suffered actual damages in that he was unable to refinance his loan, resulting in foreclosure. Cenlar argues that the 60-day hold on reporting Plaintiff's delinquency does not apply because the October Letter was not a QWR. For the reasons explained above, Plaintiff plausibly alleges that the October Letter was a QWR. Plaintiff's allegation that Cenlar failed to stop providing information regarding an overdue payment following receipt of the QWR plausibly states a claim under RESPA.

## II.    Claim Two – Breach of Contract

Plaintiff alleges that Citi waived its right to demand the balance of the loan following the maturity date and that Citi breached its contract[2] with Plaintiff by foreclosing on Plaintiff's

---

[2] The parties do not dispute that the Note and Deed of Trust are unmistakably connected and comprise the disputed contract between Plaintiff as borrower and Citi as lender. The Court agrees. *McInnis v. Lind*, 198 Or. App. 139, 149 (2005) (stating rule for determining if two separate documents make up a single contract).

Property.[3] Citi argues that the allegations in the Amended Complaint demonstrate that Plaintiff's waiver theory fails as a matter of law, and it did not breach its contract with Plaintiff.

"[W]aiver is the voluntary relinquishment of a known right." *Alderman v. Davidson*, 326 Or. 508, 513 (1998). To waive a contractual right, the seller must act with the "knowledge and intention" to surrender that right. *Id.* (quoting *Mitchell v. Hughes*, 80 Or. 574, 580–81 (1916)). A "clear, unequivocal, and decisive act [is] required to show waiver by conduct." *Bennett v. Farmers Ins. Co. of Oregon*, 332 Or. 138, 157 (2001).

Plaintiff's allegation that Citi waived the maturity date is a legal conclusion that is "not entitled to the assumption of truth." *Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 664). Accepting Plaintiff's *factual* allegations as true, the Court must determine whether Citi's conduct plausibly shows a clear and unequivocal intention to waive the maturity date and Citi's right to foreclose.

The Note contained a maturity date of April 1, 2021 at which date the outstanding balance of Plaintiff's loan would come due. Plaintiff did not pay the balance of the loan on the maturity date. In April 2021, Citi's agent, Cenlar, continued collecting several automatic monthly payments from Plaintiff.[4] In September 2021, Cenlar discontinued its practice of automatically collecting payment from Plaintiff's bank account. On January 21, 2022, Cenlar sent Plaintiff a letter stating that he could avoid foreclosure by paying the "total amount due" on the "monthly payments" owed up to that date. The letter allegedly did not include a demand for

---

[3] Plaintiff also argues that Citi breached its contract by failing to give notice of foreclosure in violation of the Oregon Trust Deed Act. This theory of liability against Citi does not appear in Claim Two and the Court will not consider it. *See Schneider*, 151 F.3d at 1197 n.1 (a brief in opposition to a motion to dismiss cannot be used to amend the complaint).

[4] "It is a fundamental tenet of agency law that payment to an agent authorized to receive it is payment to the principal." *Alderman*, 326 Or. at 515. Cenlar's actions in servicing the loan are attributable to Citi.

the balloon payment, which remained outstanding. In response to the January 2022 letter,
Plaintiff sent a check for the past monthly payments Cenlar had demanded, but Cenlar refused to
accept the check and claimed that Plaintiff's payment was inadequate. Cenlar's refusal of the
payment it demanded repeated in May 2022 and September 2022. In December 2023, Quality
served Plaintiff a Notice of Default indicating that it would foreclose on Plaintiff's Property
because the loan had matured in April 2021, and the balance of the loan was still outstanding.
Recorded Notice of Default and Election to Sell. The Deed of Trust specified that "forbearance
by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law,
shall not be a waiver of or preclude the exercise of any such right or remedy." Deed of Trust at
¶ 10.

      Cenlar's demand letters plausibly show a clear and decisive intention to forbear its right
to foreclose on Plaintiff for his default on the monthly payments. Regardless of whether this
amounted to a waiver of *that right*, the "waiver of the right to enforce one provision of a contract
does not automatically waive the right to enforce another." *Alderman*, 326 Or. at 513. Plaintiff's
default on the monthly payments or the balloon payment each provided an independent basis for
Citi to foreclose on Plaintiff's Property. Deed of Trust ¶ 17. Plaintiff does not dispute that Citi
foreclosed because Plaintiff defaulted on the balloon payment, not because he failed to make the
monthly payments that Cenlar demanded and then refused to accept. Plaintiff's allegations do not
plausibly show that Citi unequivocally intended on waiving its right to demand the balloon
payment following the maturity date. Plaintiff's Second Claim for Relief is dismissed for failure
to state a claim.

III.    **Claim Three – The Duty of Good Faith and Fair Dealing**

Plaintiff alleges that Citi's conduct in waiving the maturity date and then foreclosing after refusing payments its agent instructed Plaintiff to make breached the duty of good faith and fair dealing.[5]

In general, every contract contains an implied duty of good faith and fair dealing which "serves to effectuate the objectively reasonable expectations of the parties." *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010). "[A] party may violate its duty of good faith and fair dealing without also breaching the express provisions of a contract." *Elliott v. Tektronix, Inc.*, 102 Or. App. 388, 396 (1990). The purpose of this implied duty is to deter the parties from engaging in "improper behavior" in the performance and enforcement of the contract. *Klamath Off-Project Water Users, Inc.*, 237 Or. App. at 445.

Liability for breaching the duty of good faith and fair dealing cannot be based on conduct that is entirely consistent with a written contractual term or right to a remedy "'that is expressly permitted by the contract.'" *Id.* (quoting *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000)). For example, in *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 647 (1995), the loan agreement authorized the lender to foreclose if the borrower defaulted. When the borrower had difficulty meeting its obligations to make monthly interest payments, the lender reassured the borrower that they would work together "to resolve any problems surrounding the loan." *Id.* After the lender refused to grant an extension and foreclosed on the property, the borrower sued

---

[5] Plaintiff also argues that Citi breached the duty of good faith and fair dealing by failing to comply with the Oregon Trust Deed Act during the foreclosure proceedings. This theory of liability against Citi does not appear in Claim Three of the Amended Complaint and the Court will not consider it. *See Schneider*, 151 F.3d at 1197 n.1 (a brief in opposition to a motion to dismiss cannot be used to amend the complaint).

for breach of the implied duty of good faith and fair dealing. *Id.* at 644. The Oregon Supreme Court affirmed dismissal of the claim, holding:

> if a written contract between the parties expressly allows for a particular remedy by one of the parties, in the face of a specified breach, the parties' objectively "reasonable expectations" under the contract include the invocation of that remedy in the face of that breach. The party invoking its express, written contractual right does not, *merely by so doing*, violate its duty of good faith.

*Id.* at 645 (emphasis added). The borrower failed to state a claim because merely foreclosing following the borrower's default was consistent with the express terms of the written contract. *Id.* at 647–48.

Here, the Note and Deed of Trust unambiguously authorized Citi to accelerate the loan and invoke the power of sale if Plaintiff defaulted on the monthly payments or the balloon payment. Citi's invocation of the power of sale following Plaintiff's default on the balloon payment is consistent with the express terms of the contract and the parties' objectively reasonable expectations. Plaintiff's allegation that Citi breached the implied duty of good faith and fair dealing by foreclosing on Plaintiff's Property following his failure to make the balloon payment fails to state a claim.

However, Cenlar's conduct, as Citi's agent, provides a separate basis for this claim. Although merely invoking its right to foreclose following default on the balloon payment was consistent with the express terms of the contract, Cenlar's repeated refusal to accept the specific amounts it had demanded was inconsistent with the parties' objectively reasonable expectations. Plaintiff alleges that on January 21, 2022, Cenlar sent Plaintiff a letter asking him to pay the total amount due up to that date, $7,095.04. Am. Compl., ¶¶ 13–14. After receiving the letter, Plaintiff sent a check for $7,095.04, however, Cenlar returned the check, claiming that Plaintiff's payment was inadequate. Cenlar sent another letter on May 18, 2022, demanding $11,329.80, which it

described as the total amount due. In response, Plaintiff again sent a check for the specific

amount demanded, which Cenlar again refused. This pattern repeated a third time following

Cenlar's September 12, 2022 letter, which demanded $15,329.56. Am. Compl. ¶¶ 13–16.

Cenlar's conduct far exceeds the lender's conduct in *Uptown Heights Associates Ltd.*

*Partnership*, 320 Or. 638. Whereas the lender in *Uptown* merely provided assurances that it

would work with the borrower "to resolve any problems surrounding the loan", 320 Or. at 647,

here, Cenlar repeatedly refused to accept the specific payments it had unilaterally demanded in

written letters over the course of nine months. Cenlar's alleged conduct was misleading and

confusing. Although the contract allowed Citi to exercise discretion in how it responded in the

event of Plaintiff's default, a party cannot legally abuse its exercise of that discretion. *Best v.*

*U.S. Nat. Bank of Oregon*, 303 Or. 557, 563 (1987) ("If the discretion is exercised for purposes

not contemplated by the parties, the party exercising discretion has performed in bad faith.").

The purpose of Cenlar's repeated refusal to accept the payments it specifically demanded is

unknown at this stage. Based on the terms of the contract, however, the parties did not

contemplate that Cenlar would exercise its discretion in an unreliable manner by repeatedly

refusing to accept its own demands. Plaintiff plausibly alleges that Citi, through its agent Cenlar,

breached the implied duty of good faith and fair dealing.

## IV.    Claim Four – Intentional Infliction of Emotional Distress ("IIED")

Plaintiff alleges that Cenlar, Citi, and Quality ("Defendants") caused Plaintiff severe

emotional distress by attempting to foreclose after waiving the maturity date. Am. Compl. ¶¶

57–58. Plaintiff alleges that continuing to draw monthly payments after the maturity date,

refusing to accept the payments Defendants had instructed Plaintiff to make following the

maturity date, and foreclosing without proper notice or publication were extraordinary

transgressions of the bounds of socially tolerable conduct. Defendants argue that the foreclosure was lawful but even if it was not, Plaintiff's allegations do not give rise to an IIED claim.

To state a claim for IIED, the plaintiff must allege facts that plausibly show: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's actions caused the plaintiff severe emotional distress, and (3) the defendant's actions transgressed the bounds of socially tolerable conduct." *Schiele v. Montes*, 231 Or. App. 43, 48 (2009). "'Liability [for IIED] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *House v. Hicks*, 218 Or. App. 348, 358 (2008) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Whether the conduct may be characterized as extreme or outrageous is examined within the context of the relationship between the plaintiff and the defendant. *Delaney v. Clifton*, 180 Or. App. 119, 130 (2002) (special relationship such as that of common carrier-passenger may create a heightened duty) (quoting *Rosenthal v. Erven*, 172 Or. App. 20, 23 (2001)). Whether a defendant's conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery" is a question for the court. *House*, 218 Or. App. at 358.

Plaintiff's allegations do not plausibly show that Defendants intended to cause Plaintiff severe emotional harm. The parties had an arms' length relationship arising from a mortgage loan and Defendants conduct was directed towards enforcing the terms of the loan. Plaintiff also fails to allege facts plausibly showing that Defendants engaged in conduct that was outrageous and beyond all possible bounds of decency. Plaintiff's Fourth Claim for Relief is dismissed for failure to state a claim.

**V.      Claim Five – Unfair Trade Practices Act ("UTPA") Or. Rev. Stat. ("ORS") 646.608**

Plaintiff alleges that Defendants willfully violated the UTPA by making false or misleading representations and engaging in unfair or deceptive conduct. Defendants argue that Plaintiff's claim fails as a matter of law because the UTPA does not apply to loans that originated prior to 2010, such as Plaintiff's.[6]

"Oregon's UTPA, like those of many other jurisdictions, was enacted as a comprehensive statute for the protection of consumers from unlawful trade practices." *Pearson v. Philip Morris, Inc.*, 358 Or. 88, 115 (2015). The UTPA allows for a private cause of action that "must be brought within one year after discovery of the unlawful conduct." *Id.* at 116; ORS 646.638(6). For many years, the UTPA did not apply to "loans or extensions of credit." *Lamm v. Amfac Mortg. Corp.*, 44 Or. App. 203, 204 (1980). That changed, however, in 2010 when the Oregon legislature amended the UTPA to include "loans and extension of credit" in the definition of "real estate, goods or services." H.B. 3706, 75th Leg., 1st Spec. Sess. (Or. 2010) (amending ORS § 646.605(6)). Notably, "[t]he Oregon legislature did not express an intent that the amendment apply retroactively, and numerous decisions from this district have determined that the UTPA does not apply to mortgage loans when the deed of trust was created before the 2010 amendment." *Santoro v. Ocwen Loan Servicing, LLC*, No. 6:14-CV-00522-AN, 2023 WL 8355367, at *8 (D. Or. Dec. 1, 2023); s*ee Nelson v. Fay Servicing, LLC*, No. 3:22-CV-01911-HZ, 2023 WL 6122685, at *10 (D. Or. Sept. 15, 2023) (compiling cases); *see also State v. Tucker*, 90 Or. App. 506, 509 (1988) (statutes do not apply retroactively "if doing so will impair existing rights, create new obligations or impose additional duties with respect to past acts").

---

[6] The Court dismisses the UTPA claim based on the loan's origination date and does not address Defendants additional argument that Plaintiff's UTPA claim is barred by the statute of limitations.

Here, it is undisputed that the Note and Deed of Trust both originated prior to the 2010 amendment to the UTPA. Plaintiff argues, however, that Cenlar's 2022 letters demanding "the total amount due" to avoid foreclosure were misrepresentations about an extension of credit distinct from the 2006 loan, giving rise to an actionable UTPA claim. Pl.'s Resp. at 15 (citing *Rubic v. Wells Fargo, Nat'l Ass'n.*, No. 3:13-CV-01982-AC, 2015 WL 632235 (D. Or. Feb. 13, 2015) and *Egbukichi v. Wells Fargo Bank, NA*, 184 F. Supp. 3d 971, 977 (D. Or. 2016)).

The cases cited by Plaintiff in support of this argument are distinguishable from the facts of this case. In both cases, the negotiations occurred in response to each plaintiff's formal request for a loan modification. *Rubic*, 2015 WL 632235, at *1; *Egbukichi*, 184 F. Supp. 3d at 975. The court in each case reasoned that, although the loan originated before the 2010 amendment to the UTPA, the lender's misconduct during the loan modification negotiation was actionable because the alleged misrepresentations related to an extension of credit that arose post 2010. *Rubic*, at *2; *Egbukichi*, 184 F. Supp. 3d at 977. Here, in contrast, Defendants' demand for monthly payments following the maturity date does not reasonably lead to an inference that the parties were engaged in a negotiation over a loan modification. Forbearance in accepting monthly payments following the maturity date was permitted under the express terms of the loan. Plaintiff fails to plausibly allege that Defendants engaged in unfair trade practices related to an extension of credit that arose after 2010. Plaintiff's Fifth Claim for Relief is dismissed for failure to state a claim.

## VI.    Claim Six – Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. § 1692

Plaintiff alleges that Quality violated § 1692f(6) of the FDCPA by foreclosing on Plaintiff's Property despite "actual knowledge that Cenlar had waived the right to foreclose." Am. Compl. ¶ 77. Plaintiff also alleges that Quality violated the FDCPA by foreclosing without

proper publication of service (ORS 86.774) and without a proper sale (ORS 86.782). Am.

Compl. ¶ 76. Quality argues that a nonjudicial foreclosure is not actionable under the FDCPA.

The FDCPA "exempts entities engaged in no more than the 'enforcement of security

interests' from the *lion's share* of its prohibitions." *Obduskey v. McCarthy & Holthus LLP*, 586

U.S. 466, 481 (2019) (emphasis added). However, "enforcing a security interest does not grant

an actor blanket immunity from the [FDCPA]." *Id.* at 480. "[T]hose who engage in only

nonjudicial foreclosure proceedings" are subject to § 1692f(6) of the FDCPA. *id.* at 477, and are

also subject to state regulation, *Barnes*, 963 F.3d at 1001.

Section 1692f(6) of the FDCPA prohibits a party from:

**(6)** Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--

> **(A)** there is no present right to possession of the property claimed as collateral through an enforceable security interest;

> **(B)** there is no present intention to take possession of the property; or

> **(C)** the property is exempt by law from such dispossession or disablement.

15 U.S.C. § 1692f.

Quality's nonjudicial foreclosure of Plaintiff's Property is subject to § 1692f(6).

*Obduskey*, 586 U.S. at 481. Plaintiff alleges that Quality conducted a nonjudicial foreclosure

despite actual knowledge that Cenlar had waived the maturity date and right to foreclose. This

allegation arguably implicates § 1692f(6)(A), which prohibits an entity from effecting a

nonjudicial foreclosure without the present right to possession. However, as described above,

Plaintiff's allegation that Cenlar or Citi waived the maturity date or the right to foreclose for

default on the balloon payment is a legal conclusion unsupported by plausible allegations.

Plaintiff's allegations regarding Quality's failure to properly serve notice, failure to adequately

publish, and failure to properly effectuate the sale of Plaintiff's Property implicate violations of state law, they do not implicate violations of the FDCPA. *Id.* at 480 ("antecedent steps required under state law to enforce a security interest" are not within the scope of the FDCPA). Plaintiff's Sixth Claim for Relief is dismissed for failure to state a claim.

## VII.    Claim Seven – Declaratory Judgment

Plaintiff alleges that he is entitled to a declaratory judgment that the sale and related trustee's deed is void, or alternatively, that Defendants are required to convey the subject property back to Plaintiff. Am. Compl. ¶¶ 80–81. Defendants argue that Plaintiff may request declaratory relief in his prayer, but a declaratory judgment cannot be a standalone claim.

"When presented with a claim for declaratory judgment, . . . federal courts must take care to ensure the presence of an actual case or controversy[.]" *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir. 2007). Unlike the cases cited by Defendants, in which the court dismissed a standalone claim for a declaratory judgment because there was no underlying case or controversy, Plaintiff plausibly alleges an actual case or controversy.[7]

Plaintiff asserts that a declaratory judgment is the vehicle for deciding whether the foreclosure sale must be set aside, or whether Mr. Brady's redemption rights were triggered by Defendants' alleged violations of the Oregon Trust Deed Act. Plaintiff alleges that the foreclosure sale was originally scheduled for April 24, 2024, however, Quality postponed the sale to May 15, 2024. Plaintiff alleges that Quality violated the Oregon Trust Deed Act when it failed to serve notice of the amended sale date, failed to record an affidavit of service of the amended sale date, and failed to record notice of the amended sale. Am. Compl. ¶¶ 31–33.

---

[7] Defendants' support of this argument includes citations to *McKee v. Gen. Motors Co.*, 601 F. Supp. 3d 901, 910 (W.D. Wash. 2022) and *Van Nguyen v. Specialized Loan Servicing LLC*, No. 3:18-CV-655-SI, 2018 WL 6519031, at *2 (D. Or. Nov. 13, 2018).

Violations of the Oregon Trust Deed Act, in certain circumstances, can provide a basis for setting aside a nonjudicial foreclosure. *Staffordshire Invs., Inc. v. Cal-W. Reconveyance Corp.*, 209 Or. App. 528, 542 (2006) ("The Act represents a well-coordinated statutory scheme to protect grantors from the unauthorized foreclosure and wrongful sale of property, while at the same time providing creditors with a quick and efficient remedy against a defaulting grantor."). Defendants challenge the factual accuracy of Plaintiff's allegations, citing to the Recorded Notice of Default and Election to Sell which states that a "foreclosure sale is scheduled for 4/24/2024. The date of this sale may be postponed." the Recorded Notice of Default and Election to Sell at 5. However, this document, as well as the Recorded Notice of Sale fail to rebut Plaintiff's allegations that Quality did not serve notice of the *amended* sale date, that it failed to record an affidavit of service of the *amended* sale date, and that it failed to record notice of the *amended* sale. Plaintiff plausibly alleges that the sale of his Property and related trustee's deed may have been voided by Defendants' alleged violations of the Oregon Trust Deed Act, entitling him to a declaratory judgment.

## VIII.   Leave to Amend

Fed. R. Civ. P. 15(a)(2) provides that the "court should freely give leave [to amend a pleading] when justice so requires." A district court should apply Rule 15's "policy of favoring amendments . . . with extreme liberality." *Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (quotation marks omitted). The purpose of the rule "is 'to facilitate decision on the merits, rather than on the pleadings or technicalities.'" *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (quoting *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649 F.3d 1143, 1152 (9th Cir. 2011)). A district court, however, may, within its discretion, deny a motion to amend "due to undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of

allowance of the amendment, [and] futility of the amendment." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (alteration in original) (quoting *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008)).

Following Defendants' removal of the case to this Court, Plaintiff amended his complaint pursuant to stipulation of the parties under Fed. R. Civ. P. 15(a)(2). The operative complaint, Amended Complaint ECF No. 10, was filed by Plaintiff's former counsel on June 21, 2024. Plaintiff's former counsel moved to withdraw on July 12, 2024 and his current counsel appeared on September 30, 2024. ECF Nos. 17, 31. Plaintiff has not had the opportunity to cure deficiencies by amendments previously allowed by the Court. The Court finds that granting leave to amend would not be futile. Plaintiff is given leave to file an amended complaint within 14 days of this Opinion and Order.

## IX.   Citi's Request for Fees and Costs

Citi requests that the Court award it fees pursuant to the attorneys fees and costs provisions of the Note and Deed of Trust. Alternatively, Citi requests that the Court award it fees pursuant to the UTPA. A *prevailing party* may be awarded attorneys fees if expressly permitted by contract or statute. *Hughes v. Bembry*, 256 Or. 172, 177 (1970). Citi has not prevailed in this matter and its request for fees is denied.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

The Motions to Dismiss filed by Cenlar (ECF No. 13); Citi (ECF No. 18); and Quality (ECF No. 20) are GRANTED in part and DENIED in part. Plaintiff's Second Claim for Relief (Breach of Contract), Fourth Claim for Relief (IIED), Fifth Claim for Relief (UTPA), and Sixth Claim for Relief (FDCPA) are DISMISSED without prejudice. Plaintiff is given leave to file an amended Complaint within fourteen days of this Opinion and Order.

DATED this 24th day of April 2025.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge